And will you call the next piece, please? Piece number 313-0010. Mark Carlson, Mark Carlson, and Thomas Vanna, Appellants, by Pamela Davis-Gorkowski, v. Letke & Associates, Ltd., Joseph Letke, Appellee, by Richard Tillman, and Daniel J. McNamara, Appellee, by Julie Tischer. Ms. Gorkowski? I'm going to interrupt for a second. Madam Bailiff, have you had a chance for a break yet? No, I'm fine. Could you take a break right now while we're here? No, I'm fine. Are you sure? Yes, sir. I'm fine. All right, we'll try it again. Ms. Gorkowski? Thank you. I hope my time starts now. Sorry, it started at 1.15. May it please the Court? Counsel? Plaintiffs in this case are appealing from the summary judgment entered by Judge Powers in this action. This action is a negligence case against an accountant and his corporation, along with an attorney who worked for the accountant. The allegations are that the accountant negligently advised the plaintiffs to enter into an investment, and also that they failed to conduct due diligence on the investment and made other misrepresentations. They answer the liability. The plan was that a group of investors, including the plaintiffs and Lutke, would form an LLC, which would purchase the controlling interest of an LLC owned by Giersig Realty. And so each plaintiff, including Lutke, signed a guarantee. In April 2007, the plaintiffs paid purchase prices toward the contracts, so they had entered into a guarantee of the purchase price for $48 million. In April 2007, the Carlsons paid $2 million as part of the initial investment. Vanna also paid $500,000 as part of the initial investment. Later, the Carlsons also made purchase price payments of $1 million and further made payments on principal and interest on the construction loans to keep those in business. The LLC that they were purchasing owned real estate, and the plan was to develop that. In August 2007, Giersig found the plaintiffs in default and filed a lawsuit against the plaintiffs. And the plaintiffs initially in that lawsuit, the parties, Lutke, the Carlsons, and Vanna, were jointly represented by counsel, first Dykema and then Pretzel, and that continued through May 2009. While the case was pending, according to the depositions, Mr. Lutke kind of led the defense. Motions to dismiss Giersig's lawsuit were filed, alleging that there was fraud by Giersig. The investors in that case also filed counterclaims against Giersig. Eventually, Giersig, I mean, Lutke got his own attorney, and eventually the case settled in 2011. The Carlsons paid $2 million to settle, Vanna paid $2 million to settle, and even though Lutke had signed the same guarantee and was part of the suit, he paid $150,000 to settle. When the plaintiffs in this case got their own attorney, according to their depositions, they found that Lutke had done some improper actions, such as withdrawing funds from an account, and so they filed a suit in 2010. Judge Powers dismissed the case based on the statute of limitations. One of our contentions on appeal is that under the adverse judgment rule, the cause of action didn't accrue until that underlying case was resolved, because a cause of action doesn't accrue until there are certain non-speculative damages, and until that happens, regardless of your knowledge of someone's wrongdoing, the cause of action doesn't accrue. So in Illinois... How does a settlement determine damages? Under the adverse judgment rule, and under also the twin rule of tax cases where there's a deficiency, the notice of deficiency rule, the courts have said, including Kahn in the Supreme Court, have said that if a pending suit involving the investors or the clients could determine whether or not they have damages and result in a situation that they're not damaged, such as you have a settlement where, in our case, many have paid something to the plaintiffs, or in Kahn, where you have a tax deficiency case in the IRS pending, and that that could resolve in such a way that the plaintiff doesn't have damages, notwithstanding they think that their accountant or their attorney committed malpractice, that can render the damages uncertain. And so the Kahn Supreme Court and the Kahn Appellate Court discussed this. So what happened in Kahn is that the investors invested $350,000 in a tax shelter in 1999. They invested $850,000 or so in 2000 in the tax shelter. Later the IRS disavowed the shelter. Their damages included the tax deficiency. So there the trial court said the cause of action was time barred because they should have filed within two years of, or whatever the period of limitation was, within that time of the year 2000 investment. The Appellate Court reversed and the Supreme Court affirmed, saying that until the tax proceeding, so the IRS disavowed the investment, and the Appellate Court and the Supreme Court said that while those legal proceedings were pending, it could have been resolved in favor of the investors, they could have reached a settlement with the tax people, and until that was resolved by the notice of deficiency, that was certain enough. Until that happened, the cause of action didn't accrue because their damages were still uncertain because they may have prevailed in that case. In our case, as in Kahn, we made initial investments under the contract. Geerzyk filed suit against us. We alleged that, along with Letke, that Geerzyk was fraudulent and was the one who caused the investment to fail. We had counterclaims, and under the adverse judgment rule, and under Kahn and the Supreme Court and the Appellate Court, the damages aren't certain until the case is over because we could have prevailed. We could have had a judgment in our favor. We could have prevailed on our counterclaims. Look, I know the Supreme Court said it, but does that make any sense to you about how to determine when a cause of action accrues, as the one you know when damages are certain? Well, it makes sense because— Look, I'm just saying, what if you tried to apply that to a personal injury action? You'd say, well, you've got an accident, but the cause of action didn't accrue because the jury might have found the defendant not guilty, and he didn't owe me anything, or my damages weren't as much as I thought. To decide the cause of action accrues after a final determination of exactly what the damages are seems to me to not make much sense. I'm not sure it would apply in a personal injury case because the rule basically—the adverse injury rule applies where a professional gives professional advice that causes some damage to his client or the investor that results in that client or investor getting into a lawsuit or legal proceedings that affects whether or not he actually has a monetary loss. So if you had a personal injury case, I don't think that you could have— I don't see how that would apply because it assumes that there's an underlying malpractice case. So you first have a case you're brought into because you didn't pay enough taxes or because somebody says you owe money because of the investment or whatever reason, and then a lawsuit—that lawsuit has to be resolved before we know for certain that there's damages. Why? Well, because as the preferred personal or personal products case says, in that case, an agency like an employment agency sued its broker who was supposed to provide workers' comp insurance, and the broker didn't provide the insurance and the agency had to pay out expenses related to claims. They hired an attorney to bring a malpractice case against the broker and he failed to do it. So what happened there is the agency brought a lawsuit against the broker and the attorney at the same time alleging the attorney was guilty of malpractice and that the broker was guilty of malpractice. The appellate court said the case against the attorney is premature because we don't even know if there's damages that the agency is going to incur until we know the outcome of the first case. And so in our case— You agree with that? I do, Your Honor. I mean, isn't that the same? Every legal malpractice case, you always try the underlying case. And you say, gee, my lawyer didn't file for his statute of limitations. Well, inside of that case, you try the underlying case in essence to show that there was damage. If he had acted on time, it would have filed there. But you don't say that the malpractice case is premature because it hasn't been determined. That's just part of your burden of proof is not only did he blow the statute of limitations, but I was damaged by it, and I can prove it because if he had of, I'd have recovered these damages. Your Honor, in this case, it's as if the underlying case is— your example was he blew the statute of limitations. My lawyer blew the statute of limitations, and now I'm suing him for malpractice. So the underlying case is the case that the lawyer was supposed to file that he failed to. But if he filed it, and now it's still pending, was it time-barred or not? Is the plaintiff going to get damages or not? That case within the case, that inside case, has to be resolved before you can sue the lawyer for malpractice under this rule. I'm not sure that that's true. Because you wouldn't want—what the cases are saying is that second suit may become completely unnecessary. So in your example, if the personal injury case, if he says, gee, you messed up, you filed it too late, but then, lo and behold, they give him a settlement, and he's totally compensated, even though he messed it up, even though the lawyer messed it up, you wouldn't— the second case now is dependent on the outcome of the first case. The defenses raised in the first case could be used in a malpractice case. That's what the kind of public court says, that you could raise a defense, and you bring the claim, and then that could be used against you in the underlying case. So in that case you have—I think that you would have to resolve, did the plaintiff— did the attorney—was the case barred or not? And if they entered into a settlement and gave him $5 million and everything he asked for, that second case is unnecessary. So part of the reason for the rule is judicial economy. We don't want to bring the second case, that sort of—they call it the prophylactic of the first case. It's a bright-line rule that gives—everybody knows what the rule is without the outcome. The person can use what you say in the first case against you. So like in this case, in 2009, the plaintiffs—the defendants are saying that we should have brought suit in 2009. We brought it in 2010. But if we brought—bringing the suit, saying, well, the investment failed because of Lettke and McNamara, that gives Giersenk an out for saying, well, it was because of your fraud. So when you're—the outcome of the second—when the outcome of the first case tells us whether or not there's damages in a business transaction where there's investments, that is determinative of the second case, and the second case may be unnecessary. And I think that this case is controlled by Kahn. It's just like Kahn, only this case is a legal proceeding and Kahn is a tax proceeding. You know, Lettke kept on giving assurances, didn't he? Correct, but that's our alternative argument, that Lettke and McNamara are a stop from raising the statute of limitations. So when the Carlsons were making those payments pursuant to the contract, in performance of the contract, trying to get the contract to work out, Lettke said, we're going to make a lot of money. You're going to get all this money back. Then once the lawsuit was filed, Lettke said, don't worry. This case and the failure of the investment is because of Giersenk's fraud, not us. And I'm going to be able to work this out with him because I have a good relationship with him, I guess, is what was implied. And we're going to resolve this and we're going to win. So he made those reassurances. And again, he led the defense, arguing that it was Giersenk who was fraudulent. And the Carlsons and Vanna relied on their accountant who had advised them to enter into the investment. And they didn't file a lawsuit until they found evidence of wrongdoing. Who decides whether to apply equitable estoppel? In other words, we're going to look past the statute of limitations. Is it the trial judge? Is it the finder of fact? Is that a legal question? Is it a factual question? One thing is whether to apply equitable estoppel. Well, I think there has to be some factual issues in there. Did they rely on the... There are some fact issues in there, whether the conduct of the defendant was the cause of delaying the lawsuit. I think there are fact issues as to that. But it's ultimately an equitable remedy, isn't it? It is an equitable remedy. Who gets to make that call? Well, whether it's... In part, it has to be a legal question, because in Jackson Jordan, they decided that this could be something that would be presented to the jury. So I think in the end, it's a jury question. But whether it's initially going to be allowed, I guess, whether it's going to go to the jury, and whether you've alleged enough, sort of like whether you've stated a claim for equitable estoppel, that would be probably a legal question. Do you have enough here for equitable estoppel to be sort of pled? And then after that, there are things you have to show that would be questions of fact with the jury. So one of the questions of fact might be, was there a fiduciary duty? Because if you have a fiduciary duty, then in that situation, according to Witherill v. Weimer, even your silence can be sufficient for estoppel to arise. If you have a fiduciary duty relationship and you don't reveal a cause of action, that can be enough for equitable estoppel under Witherill v. Weimer. This adverse judgment rule would only apply in the situation where the underlying lawsuit has an impact on whether or not the investor or the client incurs damages. So in a case where it's unrelated, for example, it wouldn't apply. So I just want to make it clear that there are limitations on the adverse judgment rule. Thank you. All right, thank you. I'm not sure who's going first. Mr. Tilghman? Yes. Good afternoon. Rich Tilghman. It pleases the court. I represent the defendants' appellees, Joe Ledtke and Ledtke and Associates. This case arises, as we know, from a failed real estate transaction where Ledtke and a group of his accounting clients got together, many of whom own their own businesses. They formed a limited liability company to invest in a series of other limited liability companies that held real estate properties in Illinois, Indiana, and Michigan. The transaction was structured in two phases. There was supposed to be an initial closing that was going to occur in April of 2007 and a final closing that was going to occur in October of 2007. At the initial closing, the LMLG parties were going to make a $1 million payment and sign a $48 million promissory note personally guaranteed by all the LMLG investors. That promissory note was scheduled to be paid off at the final closing in October of 2007. The plan was that these properties would be redeveloped, refinanced, and that the money from those redevelopments and refinancing would be used to pay off that $48 million note in October of 2007. Lo and behold, that never occurred. They never got the developments going, never got the refinancing going. They defaulted on the note in October of 2007, and the deal never finally closed. The LMLG transaction never was finally consummated. By the time that occurred in October of 2007, the plaintiffs in this case, Mark Carlson and Rob Carlson, had already put $2.5 million into the deal. By the time that that default occurred in October of 2007, the plaintiff, Tom Vanna, had already put $500,000 into the deal. At this point, there was no hope of recovering the LMLG transaction, as that final closing never occurred and was never extended. Next, the Geerzyk, the seller in the LMLG transaction, filed a lawsuit seeking to enforce this $48 million promissory note and guarantees against all of the parties. My client, Joe Letke, and the plaintiffs in this case. Several years later, in July of 2010, this case was filed, in which the plaintiffs alleged that Mr. Letke misadvised them to get involved in the LMLG transaction in the first place. So July of 2010 filing of this case makes the critical date for statute of limitations purposes, since we're dealing with a two-year statute, July of 2008. What did the plaintiffs know before July of 2008? The trial court correctly determined that the plaintiffs knew of all the facts that they needed to file a lawsuit against Mr. Letke in July of 2008 and that they had been damaged before July of 2008. Mr. Vanna testified that before the critical date, he knew that the LMLG contract that had been executed was a, quote, completely onerous, terrible contract, totally in Mr. Geerzyk's favor. Within days of signing the LMLG transaction documents, he received communication from his attorney, which said, you know, you just signed documents that said that if LMLG doesn't pay off this $48 million promissory note, you're on the hook for $48 million personally. He immediately went to Letke, and he told Mr. Letke, hey, listen, I'm not a part of any guarantees here. On the issue of damages, Mr. Vanna claims in his reply brief in this case that he was never damaged until the Geerzyk case settled in 2011, so therefore the statute of limitations shouldn't start running until 2011. The problem with that argument is that there's nothing to support it in the record. In fact, the record in this case, if you look to page 16 of the record, that's the initial complaint that was filed in this case, Mr. Vanna seeks damages for $500,000, the exact amount of his initial capital contribution to LMLG, which was made before the critical date in April of 2007. So Mr. Vanna's claim that he didn't sustain any damages until the Geerzyk litigation settled in 2011 is simply wrong. He also testified that before the critical date, he knew, quote, the true value of the LMLG properties, and because of that, he was willing to sign a $28 million guarantee to settle the Geerzyk litigation. So having known the true value of the properties, his claim in this case that those properties were not properly valued, he would know whatever his damages were, the difference between what the proper values were and what the, quote, true value of the properties were. Mark Carlson similarly made several admissions to confirm that he knew of his injuries before the critical date. He testified that before the critical date, he knew that, quote, Lecky had not properly represented the deal to him. He went to Lecky and told him that, quote, guarantees are not supposed to be part of this deal. He also knew that he was damaged as he admitted that in mid-2007, he was aware that he was required to make payments of $1 million per month towards this transaction. Mark's brother, Rob, made similar admissions that he knew of his damages before the critical date. He testified that he knew in mid-2007 that Mr. Lecky's representations regarding the existence of financing on these properties were not true. He testified that he knew in mid-2007 that this transaction, quote, was not going the way it was supposed to go because, quote, money was just being expensed left and right. In light of these admissions, it's clear, and the testimony is undisputed, that they had knowledge of their claims before the critical date in July of 2008. The attempt by the plaintiffs on appeal to delay the running of the statute of limitations until that Kyrzyk settlement in 2011 should be rejected. In this case, the adverse judgment accrual rule never even comes into play because they didn't need to have that Kyrzyk lawsuit filed to know that they had been damaged. By the time that October 2007 closing doesn't occur, and by the time they put in that $2.5 million for the Carlsons and the $500,000 for the Bannas in 2007, their damages already exist. Whether or not Kyrzyk files a lawsuit is completely irrelevant to determining whether or not there are damages for them to claim in this case. Also, they knew that they had been damaged before that Kyrzyk settlement because they had been sued on an unconditional guarantee of a $48 million promissory note. In fact, their own complaint in this case contradicts their theory now on appeal that the case didn't accrue until 2011 because the case was filed in 2010. So having alleged in their complaint in this case that they had been damaged in July of 2010, they can't now come up on appeal and take the completely contrary position that no, no, no, our damages didn't really start until the Kyrzyk case was settled in 2011. Finally, the issue of equitable estoppel and the claim that Mr. Leike should be estopped from asserting the statute of limitations is not supported by evidence in the record. Equitable estoppel requires that the plaintiff reasonably rely on the representations or conduct of the defendants in delaying filing suit. Here, there's not a shred of evidence in the record that the reasons that Carlson's waited and Mr. Vanna waited to file suit until 2010 is because of anything that Mr. Leike said or did. To the contrary, the evidence shows that they, and was undisputed, that they stopped trusting Leike once they made these realizations in mid-2007. Mr. Vanna testified that in 2007, he knew that Leike, quote, wasn't looking out for his best interests. Mark Carlson testified that by May 2008, he had knowledge that, quote, Leike had not properly represented the deal to him and that there was, quote, a substantial amount of fraud in this transaction. Likewise, Mr. Rob Carlson said when he testified that he knew in mid-2007 that Leike had misrepresented the status of financing on these properties. So it's clear from the evidence and the testimony that was undisputed that there's no reliance by the defendants or by the plaintiffs on anything that Mr. Leike said or did in delaying suit. And that's a prerequisite to having a case of equitable establishment. So despite their concerns, starting way back in 2007 that Mr. Leike was responsible for getting them into this deal and that he was at fault, they delayed filing suit until July of 2010. By that time, statute of limitations had expired and the trial court correctly determined based on undisputed admissions in the record that the statute of limitations had run. Thank you. All right, thank you, counsel. Good afternoon. Julie Tischer on behalf of the defendant Daniel McNamara. I'd like to start with the equitable estoppel argument with respect to Daniel McNamara. It doesn't apply to him in this case. Plaintiff never pled fraudulent concealment against Dan McNamara. In addition to that, fraudulent concealment was never argued with respect to Daniel McNamara before the trial court. Plaintiff never argued it in response briefs, never articulated it in an oral argument. That argument is forfeited with respect to Daniel McNamara. Plaintiffs cannot now ask you to reverse the summary judgment entered in favor of Mr. McNamara on a basis that was not considered by the trial court. If this court looks past the forfeiture in this case, there is simply no evidence that Daniel McNamara fraudulently concealed plaintiff's cause of action from them. There is a high standard of proof on fraudulent concealment in the state of Illinois. Plaintiffs have to prove by clear and unequivocal evidence that the defendant misrepresented material facts, that the defendant knew these facts were untrue, that plaintiffs relied on the facts, and that the misrepresentations were calculated to delay the filing of the action or to prevent the plaintiffs from knowing they had a cause of action. There is no evidence of any of that with respect to Dan McNamara in this case. In fact, plaintiff's testimony establishes to the contrary. Mark Carlson testified, Mr. McNamara never made any statements to us. Carlson said, I never met with McNamara to discuss the pros and cons of this deal. I don't recall Mr. McNamara making any false statements to me. Rob Carlson testified, McNamara didn't give me any facts on which I relied. McNamara gave me no advice regarding this deal. He never told me whether this was a good or bad deal. Mr. Vanna said, I only met Mr. McNamara once. I have no idea as to what his involvement was for Lettke and no information as to whether McNamara was involved in the preparation of the documents. That's the extent of their testimony. There is not one statement of fact in this record whereby plaintiffs can establish that Mr. McNamara misrepresented facts or tried to delay the filing of the lawsuit or prevent them from understanding they had a cause of action. Section 13-215, therefore, does not apply to Mr. McNamara. Plaintiff cannot take advantage of the Fraudulent Concealment Statute of Limitations. The actions against Mr. McNamara are governed by two-year statute of limitations. And just as an aside,  or the Accounting Malpractice Statute of Limitations to Daniel McNamara. Plaintiff's action is barred under either statute. The courts have treated those statutes very similarly under the discovery rule with respect to the statute of limitations. In fact, the Steinmetz case says specifically that there was both illegal malpractice and accounting malpractice action within Steinmetz. And the discovery rule under those two statutes was treated identically. I'd like to adopt the Accounting Malpractice Statute of Limitations arguments that have already been made on behalf of Mr. Letke so that I don't have to repeat those arguments. There were a myriad of facts that all three plaintiffs were aware of. In the summer of 2007, and at the time they were served with the lawsuit in October of 2007, counsel has documented them. There were payments made in excess of what they were promised in terms of their liability and exposure. There were letters of default. They were served with a lawsuit asking them to pay on a guarantee for a $48 million promissory note. There's no question that they were on notice that they were in action, that they had injuries, and that their injuries may have been wrongfully caused. So under either statute of limitations, accounting or legal malpractice, plaintiff's actions were barred when they filed them in July of 2010. Thank you. Plaintiffs have conceded that there was no direct attorney-client relationship between Dan McNamara and the plaintiffs. They conceded that in their reply brief, as they should have. So what we're left with then is those limited circumstances where an attorney might have a duty to a non-client. And the Illinois cases are very clear on this point. That circumstance has only been extended in cases of wills and trusts where there are intended beneficiaries of documents drafted on behalf of a client. Plaintiffs have offered this court no case that extends an attorney-client relationship to a situation such as this. Mr. McNamara was an employee of Leckian Associates. And under the accounting malpractice statute of limitations, he's entitled to that statute of limitation, he was employed by Leckian Associates. None of the plaintiffs individually retained him. The work he did, Mr. Lecki didn't hire Dan McNamara as his attorney for the primary intent and purpose of benefiting the Carlsons and Mr. Bain. And that's the standard. Did Joe Lecki hire Dan McNamara as an employee for the primary intent and purpose of benefiting the three plaintiffs? He didn't. There's no evidence to that effect. And the case law is very clear that in order to extend a duty of an attorney to a non-client, they have to establish that the client hired the attorney for the primary benefit of the non-client. We don't have those facts here. Mr. McNamara owed no duty to plaintiffs, therefore, and would have had a second basis upon which the trial court could have entered summary judgment in his favor. No attorney-client relationship, no duty. Therefore, I'd ask this court to affirm summary judgment in favor of Mr. McNamara on both those bases, the expiration of the applicable statute of limitations and the finding of no duty, either of which would support the trial court's decision. Thank you. Thank you. Ms. Gorkowski, some rebuttal? Yes, Your Honor. Counsel states that the adverse judgment rule doesn't apply here because plaintiffs knew of their damages before the Gerzik case resolved. That's the exact facts in con that our Supreme Court rejected. In con, the plaintiffs made initial investments in 1999 and in 2000, and the cause of action didn't accrue then, according to our Supreme Court. It didn't accrue until the legal proceedings with the IRS were resolved to the point, in that case, that the IRS issued a notice of deficiency. That's when the plaintiffs were injured. The con court said before that their damages were speculative. I don't believe that we ever represented that Banna didn't make an initial investment, because certainly he did. But in our case, it's just like con. Payments were made pursuant to the contract, in performance of the contract, and then litigation ensued, and because that litigation could have made it such that the plaintiffs didn't have any damages, that case needed to be resolved before the case accrued. We have, as in con and as in Jackson-Jordan, we have alternative arguments about when the statute of limitations accrued. We argue, in part, that until 2009, when there was separate counsel, we weren't aware of. We accepted that the problem was because of the fraud by Gerzik and not by our accountant, our trusted accountant and attorney, who we shared an attorney with in the litigation, which is evidence that we did trust and rely on the accountant and the attorney. But in this case, there were initial payments, just like in con, and con is dispositive, I think. What about McNamara and the estoppel argument? Our counsel misunderstood our argument. Our argument is estoppel, not fraudulent concealment on appeal. In Levine and in Jackson-Jordan, those were raised for the first time on appeal. It was kind of mentioned in our case below after all estoppel, but we're relying on estoppel, not fraudulent concealment. And that could be raised for the first time, according to Levine and Jackson-Jordan on appeal. So our argument as to McNamara is that under Witherill v. Weimer, if you remember that case, it was a malpractice case where a woman had suffered injuries because of birth control pills. And she alleged her physician was guilty of malpractice and didn't let her know the real reason for her problems. And the Supreme Court there said silence between a fiduciary and the client is sufficient for an equitable estoppel to arise. And they said that that case could go to the jury. So our position is that McNamara... Did you make these arguments to the trial judge? Below they argued fraudulent concealment, and they mentioned equitable estoppel. Equitable estoppel wasn't specifically argued before the trial judge. Under two cases that we cite, Jackson-Jordan, a Supreme Court case, and Levine, a First District case, equitable estoppel within the discretion of the appellate court can be raised for the first time on appeal. Counsel is incorrect that you have to have a direct relationship between an attorney and a client for the relationship to arise. I sometimes represent clients where I don't meet them. I get hired by the attorney, and that happens. And that's not unusual. They make it sound like that's some crazy idea. But sometimes one person hires counsel for several parties, and it doesn't mean that they don't have an attorney-client relationship. And the case that we cite says there doesn't have to be a direct relationship and there doesn't have to be privity for the duty to arise. And if you want to take to represent the people, and you have the relationship with somebody in that group, that's sufficient. And so that's our argument is to attorney-client relationships. So if I'm out setting up a business deal, I'm going to bring people in, and I hire a lawyer to help me do that. And then I bring in other people into this deal because I don't have enough money to do it myself, presumably. My lawyer becomes their lawyer. I don't think automatically. I think it depends on the facts of the case. Well, what facts in this case made McNamara their lawyer? Well, first of all, the agreement says, the contract says, that notice is to be given to McNamara for all the investors. I think that shows an attorney-client relationship. He advised Vanna regarding the, well, he admits, first of all, he admits that he represented Carlson, Mark Carlson. That's admitted, I believe, in his deposition. He thought he represented the main investors, and that includes Mark Carlson. I think we cited that in our brief. He communicated with Brad Carlson and with Vanna. He asked them to sign the documents, and the documents show that he's supposed to receive notice for all of the investors. So I think that right there is enough evidence that there was a relationship. Well, a registered agent receives notice, you know, that type of thing. Well, he helped them sign the documents, and he forwarded the documents to them for their review and discussed it with them. That's what Brad Carlson said. We ask that the summary judgment be reversed. We think it's controlled by Conn, and thank you very much. Thank you. Thank all three of you for your arguments here today. This matter will be taken under advisement. A written disposition will be issued, and right now we'll be in the hopes of brief recess for a panel change before the next case.